## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NICHOLE M. S.,

               Plaintiff,

    v.

ANDREW M. SAUL,
Commissioner of Social Security,

               Defendant.

Case No. 19 C 7798

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Nichole M. S. seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") based on her claim that she is disabled by mental and physical impairments. Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [15] is granted, the Commissioner's Motion for Summary Judgment [20] is denied, the ALJ's decision is reversed, and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## BACKGROUND

Nichole applied for DIB and SSI on April 28, 2017 alleging disability since September 11, 2016 due to epilepsy, anxiety disorder, depression, panic disorder, personality disorder, and PTSD. Nichole was born on January 6, 1983 and was 33 years old on her alleged disability onset date. In high school, Nichole was placed in behavior disorder classes, and she dropped out in the tenth grade. Nichole obtained a general equivalency diploma at age 20. Nichole has a long history of mental health issues and substance abuse (cocaine, heroin). She has had five inpatient mental health hospitalizations with her first one being at age 12. The record further reveals that Nichole was the victim of sexual abuse as a young child and has two past suicide attempts. She has been

homeless and incarcerated several times related to substance possession. Nichole has a history of self-harm by cutting herself, and testified at the hearing that her last cutting incident was six weeks earlier. She has been diagnosed with major depressive disorder, recurrent, moderate, personality disorder, anxiety, panic attacks, and post-traumatic stress disorder ("PTSD"), and she takes psychotropic medications. Nichole went through a residential drug rehabilitation program between October 2016 and January 2017 and has been clean since then. To maintain her sobriety, Nichole goes to therapy, meets with a substance abuse counselor monthly, attends NA/AA meetings a few times a week, and is on a methadone treatment plan. Nichole also has a history of seizures and takes Keppra to prevent seizures. Nichole last worked as a cashier at a gas station on August 24, 2017, when she was physically assaulted, held at gunpoint, and had her life threatened during a robbery at the gas station. This incident, which occurred after the filing of her applications, was a significant development in Nichole's physical and mental health history.

Nichole's claims were initially denied in August 2017 and upon reconsideration in November 2017. (R. 73-138). On July 31, 2018, she appeared and testified at a hearing before ALJ Matthew Johnson. *Id*. at 32-72. The ALJ also heard testimony from vocational expert Mitchell Norman. *Id*. at 64-70. On December 12, 2018, the ALJ issued a decision denying Nichole's applications. (R. 13-25). The decision followed the familiar five-step evaluation process. 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that Nichole had not engaged in substantial gainful activity since September 11, 2016, the alleged onset date. *Id*. at 15. Although Nichole had worked after her alleged disability onset date, the ALJ concluded that her work activity did not rise to the level of substantial gainful activity. *Id*. At step two, the ALJ found that Nichole had the severe impairments of seizure disorder, depression, anxiety, personality disorder, post-traumatic stress disorder, disc bulge of the lumbar spine with osteoarthritis, and obesity. *Id*.

at 16.  The ALJ found that Nichole also had non-severe impairments of left tibia and fibula fracture, substance abuse disorder, and knee and hip injury. *Id*.  At step three, the ALJ determined that Nichole did not have an impairment or combination of impairments that met or equaled the severity of a list impairment, including Listings 1.04, 11.02, 11.03, 12.04, 12.06, 12.08, or 12.15. *Id*. at 16-18.  Applying the paragraph B criteria, the ALJ found that Nichole's mental impairments caused mild limitations in understanding, remembering, or applying information and adapting or managing oneself and moderate limitations in interacting with others and maintaining concentration, persistence, or pace. *Id*. at 17-18.

The ALJ then concluded that Nichole retained the residual functional capacity ("RFC') to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except that she can: occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch and crawl; never work in hazardous environments such as unprotected heights, near moving mechanical parts and can never operate a motor vehicle; understand, carry out, remember and perform simple, routine, repetitive tasks though not at a production rate pace (e.g., assembly line work) but would complete all end of the day goals; perform only simple, work related decisions with ability to adapt only to routine workplace changes; occasionally interact with supervisors and co-workers; perform no tandem tasks with co-workers and should have superficial, non-transactional contact with the general public. (R. 18-23). Based on this RFC, the ALJ determined at step four that Nichole could not perform her past relevant work as a finishing sander and cashier. *Id*. at 23.  At step five, the ALJ found that a significant number of jobs exists in the national economy that Nichole can perform, including cleaner/housekeeping, mail clerk, and plastic inspector. *Id*. at 24.  The ALJ thus concluded that Nichole was not disabled. *Id*. at 24-25.  The ALJ's decision became the final decision of the

Commissioner on September 25, 2019, when the Appeals Council denied Nichole's request for review. *Id*. at 1-6; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2017).

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 US 197, 229 (1938)). "Although this standard

is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

The ALJ found Nichole not disabled at step five of the sequential evaluation based on her ability to perform the identified jobs. Nichole argues that the ALJ's physical and mental RFC findings are unsupported by substantial evidence and that the ALJ erred in weighing the medical opinions of record. The Court agrees with Nichole that reversal and remand are warranted as the ALJ erred in assessing both Nichole's physical and mental residual functional capacities.

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The determination of a claimant's RFC is reserved to the Commissioner and not a medical expert. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). In forming an RFC, "an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion . . . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). At the same time, "[w]hen an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to [his] conclusion, and he may not play doctor by using his own lay opinions to fill evidentiary gaps in the record.' *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012) (internal quotation marks and citations omitted); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). To support the RFC assessment, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

A.      **Physical RFC Determination**

The ALJ's assessment of Nichole's post-assault physical RFC is not supported by substantial evidence.  The record demonstrates that most of Nichole's back limitations stemmed from the incident on August 24, 2017 in which Nichole was physically assaulted and robbed at gunpoint.[1]  During the robbery, Nichole was beaten, pistol whipped, dragged across the floor, forced into a fetal position and thrown into the bathroom. (R. 637, 746).  One of the robbers repeatedly stomped on her back. *Id*. at 746.  Nichole says the robbers argued over whether they were going to kill her, and one of the robbers held a gun to her head numerous times throughout the robbery. *Id*. at 580, 637.  Following the physical assault, Nichole repeatedly complained of pain in her lower back and hips.  She initially sought treatment from her primary care physician for pain in her back, neck, knees, and hips, and she was prescribed Naproxen for her pain. *Id*. at 474, 476.  On October 18, 2017, Nichole continued to complain to her primary care physician of low back pain and reported that her back pain was worse when standing longer or bending over. *Id*. at 661-62.  On physical examination, Nichole had tenderness in her lower back, and she received a rehabilitation referral. *Id*.

Nichole began physical therapy on November 9, 2017 with Physical Therapist Veronica Gail, who noted that Nichole presented with signs and symptoms consistent with her physician's diagnosis of lumbar pain. (R. 580).  Nichole complained of pain that felt like a "stretching and pulling" in the center of her low back and pain in her buttocks and lateral hips. *Id*.  Nichole rated her pain as 0/10 at rest and 6/10 with activity. *Id*.  She described the pain as "intense, deep pain." *Id*.  Nichole reported functional limitations with ascending and descending stairs, vacuuming,

---

[1]      Nichole was taking Baclofen, a muscle relaxant, for low back pain before the assault. (R. 474); *see also id*. at 374 (12/2/2016 Mental Health Assessment noting "back pain and hip pain from car accident.").

sweeping, lifting from the floor and overhead, pulling/pushing tasks, sleeping greater than six hours, squatting, sustained sitting and standing, twisting, turning, shoveling, and walking. *Id*. Physical therapist Gail's initial assessment noted "decreased ROM, strength, balance, flexibility, joint mobility, soft tissue mobility and increased pain, as well as impairments with posture, gait, [and] lifting mechanics." *Id*. On examination, physical therapist Gail noted palpation findings of "STR/TTP with B lumbar paraspinals, sacral attachments, glutes, and proximal ITB." *Id*.

Nichole attended twenty-one sessions of physical therapy through January 12, 2018. (R. 534). Upon discharge from physical therapy on January 12, 2018, Nichole continued to report low back pain throughout the day and difficulty with sitting and standing for an extended period of time. *Id*. Nichole rated her pain as 5/10 at rest and 7/10 during activity. *Id*. On physical exam that day, Nichole continued to present with "STR/TTP with B lumbar paraspinals, sacral attachments, glutes, and proximal ITB." *Id*. She ambulated with an antalgic gait. Nichole's physical therapist noted that she had "made objective improvements with ROM, strength" which had increased her ability to squat. *Id*. However, Nichole "continue[d] to present with impairments involving ROM, soft tissue mobility, strength, gait, pain, [and] lifting mechanics" which limited her ability to perform bending, carrying, vacuuming, sweeping, jogging/running, kneeling, lifting from the floor, squatting, and sustained sitting and standing. *Id*. The physical therapist noted that Nichole was being discharge from physical therapy "due to no more approved authorized visits." *Id*. Nichole was given a comprehensive home exercise program to assist with her continued deficits. *Id*.

On March 8, 2018, Nichole presented to the Pain & Spine Institute with lower back pain and greater trochanteric bursitis. (R. 746). Nichole rated her pain as 6/10 in intensity. *Id*. Dr. Rajesh Patel noted: Nichole "report[ed] and exhibit[ed] a decreased functionality and [quality of

life].  [T]he pain is incapacitating and [she] has a difficult time with her ADLs." *Id*.  Nichole stated

that the pain was aggravated with activity, sitting, lying supine, house work, and twisting. *Id*.  In

addition, Nichole's self-reported functional limitations from her back pain were difficulty with

lifting, bending over, twisting, prolonged positions, sitting, range of motion of the lumbar spine,

and household tasks. *Id*. With regard to her back pain, Nichole reported that she had tried

conservative therapy such as modification of activities, oral medications such as NSAIDs for at

least four weeks without relief, and physical therapy with minimal relief. *Id*.  Nichole described

her bilateral hip pain as deep, severe, constant, and dull. *Id*.  She said it radiated to her anterior

thigh and knee. *Id*.  Nichole told Dr. Patel that her hip pain was worse with prolonged sitting,

weight-bearing, and sleeping on her side. *Id*.  She also reported hip stiffness after sitting for a long

time. *Id*.  A physical examination revealed pain to palpation over bilateral GT bursa, pain elicited

over the lumbar paraspinal muscles, and reduced limited active range of motion with extension

(10 degrees) and flexion (to 30 degrees). *Id*. at 748.  Dr. Patel's primary diagnosis was lower back

pain and trochanteric area bursitis. *Id*. at 748-749.  He order a CT scan of Nichole's lumbar spine.

*Id*. at 748.

Nichole underwent a CT scan on March 19, 2018 and the impression was: (1) L4-5: diffuse

posterior disc bulge along with facet and ligamentum flavum hypertrophy causing mild spinal

canal compromise and mild bilateral neural foraminal narrowing and (2) L5-S1: diffuse posterior

disc bulge along with facet hypertrophy of facet joints causing effacement of the thecal sac not

causing significant spinal canal or neural foraminal narrowing. *Id*. at 590-91.  On March 28, 2018,

Dr. Patel diagnosed Nichole with lower back pain, trochanteric area bursitis, and lumbar

osteoarthritis and recommended intra-articular facet injection of the bilateral lumbar L4-5 and L5-

S1 vertebral levels. (R. 744).  Under Dr. Patel's care, Nichole received facet injections of the L4-

5 and L5-S1 joints on April 27, 2018. *Id*. at 739. Immediately after the procedure, Nichole reported a 100% decrease in pain. *Id*. However, at her next visit on May 10, 2018, Nichole reported pain at a 6/10 intensity and stated that the procedure had provided her with 90% pain relief for one week. *Id*. at 879. She did report an increase in function compared to her pre-procedure status. *Id*. Upon exam, Dr. Patel noted an antalgic gait, pain elicited over the lumbar paraspinal muscles, and limited active range of motion with extension (to 5 degrees) and flexion (to 30 degrees). *Id*. at 880-81. Dr. Patel recommended a second round of facet joint injections of the bilateral lumbar L4-5 and L5-S1 levels. *Id*. at 881. On May 24, 2018, Nichole returned to the Pain & Spine Institute. *Id*. at 876. She reported her pain as an 8/10 but said her symptoms had improved since her last visit. *Id*. Nichole received lumbar intra-articular facet joint injections of the L4-5 and L5-S1 joints and reported a 90% decrease in pain immediately after the procedure. *Id*. at 877.

On June 8, 2018, Nichole saw Dr. Patel for the last time in the record. (R. 872-75). Nichole complained of lower back pain and rated her pain intensity as 6/10. *Id*. at 872. She reported that the second injection procedure provided 80% pain relief for 5-6 days. *Id*. She also reported an increase in function compared to her pre-procedure status. *Id*. Dr. Patel wrote that Nichole had axial pain primarily in her lower lumbar spine with imaging evidence of facet arthropathy noted. *Id*. Dr. Patel also noted that Nichole had had "concordant relief with two separate injection[s]." *Id*. Upon examination, Nichole had an antalgic gait, pain elicited over the lumbar paraspinal muscles, and limited active range of motion with extension (to 5 degrees) and flexion (to 25 degrees). *Id*. at 874. Dr. Patel recommend radio-frequency ablation of the medial branch nerves of the lumbar L4-5 and L5-S1 joint levels.[2] *Id*. at 874. At the hearing on July 31, 2018, Nichole

---

[2]    Radiofrequency ablation is a "treatment that uses radio waves to heat and destroy a patient's nerve endings in an attempt to alleviate pain." *Marvietta H. Saul*, 2020 WL 7698369, at *1 n.4 (N.D. Ill. Dec. 28, 2020).

testified that she underwent the radiofrequency ablation procedures which made a noticeable difference "for the better," but she continued to experience back pain. *Id.* at 56. She rated her daily back pain as a constant 6 out of 10. *Id.* at 60.

The ALJ found that Nichole suffers from the severe impairment of disc bulge of the lumbar spine with osteoarthritis and obesity. (R. 16). The sole medical opinions of record regarding Nichole's physical functional limitations were those of the non-examining state agency physicians, Dr. Douglas Chang and Dr. Vidya Madala. Drs. Chang and Madala reviewed the medical record on August 20, 2017 and November 14, 2017, respectively, and concluded that Nichole retained the physical RFC to perform heavy/very heavy exertional work, except she should never climb ladders, ropes, and scaffolds and should avoid hazards such as unprotected heights, dangerous/open machinery, and any sort of commercial driving due to her seizure disorder. (R. 81-82, 85, 95-96, 99, 113-14, 118, 130-31, 135). The ALJ found the state agency physicians' physical RFC assessment unpersuasive, stating: "[t]heir opinions may have been consistent with the claimant's level of treatment and observations noted by the evidence at the time they were prepared; however, the claimant's physical therapy and lumbar injections indicate a severe impairment which limits the claimant to light work with the limited posturals discussed in the residual functional capacity above." *Id.* at 22. The ALJ then made a determination that Nichole had the RFC to perform the exertional requirements of light work with certain postural and environmental limitations.[3] *Id.* at 18.

---

[3]    Light work "requires a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b); *see also* SSR 83-10, 1983 WL 31251, at *6 (January 1, 1983) ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."). Light work also "involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

The ALJ committed reversible error in assessing Nichole's physical RFC. Given Nichole's new impairment of osteoarthritis of the lumbar spine and in formulating that RFC, the ALJ understandably discounted the opinions of the state agency physicians regarding Nichole's physical limitations as stale. (R. 22). However, after dismissing the state agency medical consultants' assessments because they were outdated, and without an opinion from another medical expert, the ALJ erred by relying on his own interpretation of the medical records to conclude that Nichole's severe back impairment "limits [her] to light work with the limited posturals discussed in the residual functional capacity above." *Id*. The ALJ's rejection of the state agency medical consultants' opinions left an evidentiary deficit regarding Nichole's physical limitations which the ALJ was not entitled to fill with his own lay opinions. *See Suide v. Astrue*, 371 F. App'x 684, 689-690 (7th Cir. 2010) (ALJ's rejection of the only recent functional assessment of the claimant's abilities left an evidentiary deficit); *Brown v. Berryhill*, 2018 WL 1635848, at *5 (N.D. Ill. Apr. 2, 2018) ("the ALJ did not rely on any medical opinion. This means that the ALJ's interpretation of the meaning of the normal findings, and how they related to plaintiff's specific symptoms, was a layperson analysis.").

Nichole testified that she is unable to sit or stand for more than 30 minutes due to her lower back pain. (R. 56, 60). She added that any kind of reaching or bending "pull[s] at [her] back . . . and causes pain." *Id*. at 62. There is no post-assault medical evidence in the record to contradict Nichole's claim. Further, the rest of the record, which the ALJ cited, does not support the limitations included in the ALJ's physical RFC determination. For instance, the ALJ identified and discussed Nichole's physical therapy and Pain & Spine Institute treatment records in the decision, but none of those records contained specific functional findings about the effect of her back impairment from which the ALJ could draw a conclusion about Nichole's abilities to work

11

on a sustained basis. (R. 21). Neither Nichole's physical therapist or her treating physicians advised that she would be able to perform the walking or standing requirements of light work. Without a medical opinion about lifting and postural limitations, it is likewise unclear how the ALJ determined that Nichole could lift up to 20 pounds and "occasionally climb ramps and stairs" and "occasionally balance, stoop, kneel, crouch and crawl." *Id*. at 18.

In assessing Nichole's physical RFC, the ALJ relied on Nichole's physical therapy treatment notes. (R. 21, 22). The ALJ wrote that after attending 21 physical therapy sessions, Nichole "was given a good prognosis on discharge." *Id*. at 21. While the discharge report shows that Nichole had increased her ability to perform squatting, she continued to have deficits in her ability to perform various other tasks including carrying and lifting from the floor and sustained sitting and standing. *Id*. at 534. Moreover, Nichole was discharged from physical therapy because she had "no more approved authorized visits," not because she had improved enough to meet her goals. *Id*. at 534-44; *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation because no expert offered evidence to that effect here.").

The ALJ further noted that Nichole's CT scan of her lumbar spine in March 2018 revealed a diffuse posterior disc bulge at the L4-5 and ligamentum flavum "causing mild spinal compromise and mild bilateral neural foraminal narrowing." (R. 21). To the extent the ALJ may have relied on the "mild" CT scan findings to conclude Nichole could perform the exertional requirements of light work, such a conclusion is improper. No doctor reviewed the mild CT scan and translated it into a finding that Nichole could work a full-time light exertional job, and the ALJ was not qualified to do so. *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("[T]he ALJ was not

qualified to assess on his own how the April 2014 MRI results related to other evidence in the record."); *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) ("[T]he ALJ was not qualified to make his own determination [of MRI results] without the benefit of an expert opinion."); *Dolan v. Colvin*, 2016 WL 6442226, at *4 (N.D. Ill. Nov. 1, 2016) (noting that "MRI report refers in places to 'mild' findings, such as 'mild lumbar canal stenosis' and '[m]ild spondylotic changes,' [but] these are medical terms that are not obvious to a layperson, and thus need interpretation by an expert.").

The ALJ also discussed Dr. Patel's findings and treatment in evaluating Nichole's physical impairments. (R. 19, 21, 22). The ALJ wrote that Nichole's lumbar facet joint injections were noted as decreasing her pain by 90% to 100% and examinations revealed negative straight leg raises and grossly normal muscle tone and strength. *Id.* at 21. The ALJ also noted that Nichole described her pain as ranging from 6 to 8 out of 10 at pain management visits and presented with an antalgic gait. *Id.* The ALJ did not mention that the injections offered only temporary pain relief. *Id.* at 872 ("The procedure provided a 80% relief x 5-6 days."); *id.* at 879 ("The procedure provided a 90% relief x 1 wk."). The ALJ also neglected to mention that during each pain management visit, Dr. Patel noted pain "elicited over the lumbar paraspinal muscles" and limited active range of motion with extension and flexion. *Id.* at 744, 748, 874, 881. Moreover, after the two rounds of injections, Nichole presented with a more limited range of motion and it was recommended that she undergo radiofrequency ablation to address her continuing back pain. *Id.* at 872, 874. In any event, and more importantly, the ALJ lacks sufficient expertise to interpret these clinical findings into the specific functional limitations that he identified Nichole could perform, namely standing or walking for six hours in an eight-hour workday, lifting up to 20 pounds at time with frequent lifting/carrying 10 pounds, occasionally climbing ramps and stairs, and occasionally balancing,

stooping, kneeling, crouching, and crawling. *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves."); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so.").

In short, the ALJ erred by not obtaining an updated medical opinion interpreting the treatment records that post-dated her assault. The ALJ found Nichole's severe impairments include disc bulge of the lumbar spine with osteoarthritis and obesity, but there are no medical records or opinions on the specific functional limitations due to those impairments in combination other than the state agency medical consultants' opinions. [4] Without citing to any medical opinion as to Nichole's capacity to walk or stand for an extended period of time, lift or carry, and engage in various postural activities, the ALJ found that Nichole can perform light work with certain postural restrictions. *See Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014) ("No doctor conducted a functional assessment, which includes a function-by-function assessment of Murphy's capability to perform light work"); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ "did not identify any medical evidence to substantiate her belief" that plaintiff "can stand for 6 hours"). Nichole's treating physicians did not provide any opinions about her functional limitations, no consultative examiner conducted a functional assessment, and the ALJ failed to call a medical

---

[4]     Nichole had a body mass index (BMI) as high as 41.2 on December 27, 2017 and on January 11, 2018, Nichole reported to her treating physician that she had "gained a lot of weight." (R. 637, 643). A BMI greater than or equal to 40 indicates extreme obesity. *Kristine S. v. Saul*, 2020 WL 4586115, at *1 n. 2 (N.D. Ill. Aug. 10, 2020). "[W]hile obesity is no longer a standalone disabling impairment, the ALJ must still consider its impact when evaluating the severity of other impairments." *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018). "The combined effect(s) of obesity with other impairments may be worse than those same impairments without the addition obesity." *Id.*; SSR 02-1p, 2002 WL 346862981, at *6 (Sept. 12, 2002) (obesity may affect "limitations in any of the exertional functions such as sitting, standing, walking, lifting, carry, pushing, and pulling" and "may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.").

expert at the hearing. "It is unclear, therefore, how the ALJ concluded [Nichole] could stand or walk for six hours a day." *Suide*, 371 F. App'x at 690. Moreover, even though Nichole reported some temporary improvement in her pain symptoms following injections and improvement of her symptoms following ambulation procedures, she testified that she continues to suffer from daily back pain at a level of six out of ten and cannot sit or stand in one position for extended periods. There is no evidence to suggest that Nichole improved to the point that she could perform light exertional work with some additional postural and environmental limitations, as stated in the RFC. *Murphy*, 759 F.3d at 819. ("One's medical condition could improve drastically, but still be incapable of performing light work. The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled."). As a result, the ALJ failed to support his physical RFC determination with substantial evidence of record, and his lay conclusion lacks support. *See Brown*, 2018 WL 1635848 at *1, 6 (remanding where the ALJ determined the plaintiff's RFC without the benefit of a medical opinion, a consultative examination or an impartial medical expert).

The Commissioner asserts that the ALJ had no duty to obtain a medical opinion or order a consultative examination to evaluate Nichole's physical limitations because Nichole's counsel represented at the evidentiary hearing that the record was complete. The Commissioner accuses Nichole of "sandbagging" by failing to request an updated medical opinion earlier. Doc. 21 at 10. The Commissioner asserts that Nichole should not "profit" from her counsel's "misrepresentation" and to the ALJ that the record was complete. *Id*. at 11.

The Commissioner's arguments fail. *First*, the Court rejects the Commissioner's contention that Nichole's counsel misrepresented that the complete record had been submitted to the agency. This is not a case where existing medical documentation was missing from the

15

administrative record.  The situation is different here, where Nichole takes issue with the ALJ's reliance on his own interpretation of the medical evidence to fill an evidentiary deficit.  At the hearing, Nichole's counsel was simply asked if he had any objection to exhibits in the file and if the record was complete, which is not related to whether the ALJ improperly filled an evidentiary gap regarding Nichole's physical RFC created by the ALJ's rejection of the state agency medical consultants' opinions.

*Second*, despite Nichole's attorney stating that the record was complete, the ALJ still had a duty to obtain additional evidence if the record was insufficient to make a disability determination.  The Commissioner ignores the fact that "[i]t is an ALJ's responsibility to recognize the need for further medical evaluations of a claimant's conditions before making RFC and disability determinations." *Chase*, 458 F. App'x at 557; *Suide*, 371 F. App'x at 690.  Nichole bore "the burden of producing medical evidence that supports her claims of disability." *Kemplen v. Saul*, --- F.3d ----, 2021 WL 345751, at *4 (7th Cir. 2021).  "[T]he [claimant's] burden is to produce evidence, not opinions." *Id*.  Nichole met her burden by coming forward with medical evidence showing back related limitations involving prolonged standing, walking, sitting, lifting, carrying, and engaging in postural activities.  Once the ALJ recognized that Nichole's physical therapy and lumbar injections indicated a severe back impairment which rendered the state agency medical opinions stale, he had an obligation to seek an additional medical evaluation of Nichole's physical condition before assessing the exertional and postural limitations she required. *Id*. ("The ALJ must seek an additional medical opinion if there is potential decisive evidence that postdates the state agency consultant's opinion.").  The Commissioner emphasizes that at the time of the administrative hearing, Nichole's counsel knew that the only two opinions on her physical functioning in the record found that she had no physical limitations, which is true, but that does

not negate the ALJ's obligation to recognize the need for further medical opinion evidence. *See Suide*, 371 F. App'x at 690 ("Although Suide shares the blame for failing to clarify the record discrepancy regarding the length of Dr. Orris's treatment, it was the ALJ's responsibility to recognize the need for further medical evaluations of Suide's conditions before making her residual functional capacity and disability determinations."); *Jody W. v. Berryhill*, 2019 WL 652247, at *3, 5 (N.D. Ill. Feb. 15, 2019) (remanding where the ALJ determined plaintiff had the RFC to perform light work "without the benefit of any medical opinions relating to [p]laintiff's knees or physical abilities generally" despite the fact that counsel mentioned bilateral knee osteoarthritis in her pre-hearing brief but "made no effort to request medical opinion evidence on the issue."). Nichole was not required to anticipate that the ALJ would discount all functional assessments of Nichole's physical abilities and use his lay opinion to fill an evidentiary gap.

Finally, the ALJ's error in assessing Nichole's physical RFC is not rendered harmless because the VE testified that that there would still be a sufficient number of jobs in the national economy if Nichole was limited to sedentary work with the same additional restrictions as in the RFC. (R. 66-67); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (error is harmless when it "would not affect the outcome of th[e] case."). Without an updated medical opinion, it is unclear whether Nichole could perform the prolonged sitting requirements of sedentary work due to her low back and hip pain and obesity. SSR 83-10, 1983 WL 31251, at *5 (1983) (for sedentary work, "sitting should generally total approximately 6 hours of an 8-hour workday."); *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014) (morbid obesity "might make it difficult for her to sit for longer periods of time as sedentary work normally requires.").

Accordingly, a remand is necessary to determine Nicole's physical RFC with the benefit of medical opinion evidence. On remand, the ALJ shall obtain a medical opinion addressing the

functional limitations arising from her physical impairments, reassess her physical residual functional capacity, and specifically explain the evidentiary basis for the physical RFC finding and the related functional restrictions.

**B.    Mental RFC Assessment**

Nichole also objects to the ALJ's formulation of her mental RFC.  Primarily, Nichole maintains that while the ALJ found the opinions of the reviewing state agency psychological consultants "persuasive" and her treating psychiatrist's opinion "unpersuasive," the ALJ ignored that mental illness does not lend itself to objective findings and failed to properly consider all the relevant evidence in the record.[5]  The Court finds, however, that the ALJ's legal error with respect to the mental RFC was the similar to the one he made regarding the physical RFC: the ALJ erred by failing to obtain an updated medical source opinion to evaluate Nichole's mental health condition after she was robbed and physically assaulted.  The ALJ's mental RFC is not supported by substantial evidence because Nichole's mental health condition deteriorated after she was robbed and assaulted and the mental health opinion evidence in the record was stale.

The Seventh Circuit has "stated repeatedly that an ALJ may not play[] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." *Kemplen*, 2021 WL 345751, at *3 (internal quotation marks)  The relevant question is "whether the new information changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [subsequent evidence] or whether the updated information was minor enough that the ALJ did not need to seek a second opinion." *Id*. (internal quotations marks and citation omitted).

---

[5]    For claims filed on or after March 27, 2017, like Nichole's claims, the regulations provide that the ALJ will articulate "how persuasive [he or she] find[s] all of the medical opinions . . . in your case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

In determining Nichole's mental RFC, the only medical opinion evidence relied upon by the ALJ was the opinions of the state agency psychological consultants. (R. 22). On August 10, 2017, state agency psychologist, Michele Womontree, Psy.D, reviewed Nichole's records and made an initial mental disability determination. In Dr. Womontree's view, Nichole had mild restrictions in understanding, remembering, or applying information and adapting or managing oneself and moderate limitations in interacting with others and maintaining concentration, persistence, or pace. *Id*. at 79, 93. She found that Nichole was moderately limited in her abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. *Id*. at 83-84, 97-98. Dr. Womontree concluded that Nichole was able to understand, retain, and carry out instructions which require some skills but do not require complex duties and would do better with low social demands on the job because of her reported interpersonal problems. *Id*. at 84, 98.

On November 8, 2017, Steven Fritz, Psy.D. confirmed Dr. Womontree's findings on reconsideration except that he concluded Nichole was not significantly limited in her ability to carry out detailed instructions. *Id*. at 110, 115-16, 127, 132-33. Dr. Fritz opined:

> This claimant has the cognitive capacity to perform and sustain three to four step tasks that require some skills but do not require complex duties of a routine and repetitive type within any limitations of physical findings. This claimant retains sufficient attention and concentration to persist at and complete work activities for

the usual periods required in the general work force. This claimant has the capacity for adequate pace and perseverance to maintain a schedule and on time attendance and has the capacity to complete a normal workday and work week on a regular basis. This claimant is able to perform at minimally acceptable rates requiring only the common frequency and lengths of rest breaks. Psychologically based symptoms would not markedly impair their capacity to complete a normal work week. This claimant has limited social tolerance therefore they would do best in a socially undemanding and restricted setting that requires reduced interpersonal contact, away from the public. They could relate acceptably with a supervisor and coworkers to the minimally necessary degree. This claimant retains the capacity to utilize public transportation to and from a place of work.

*Id*. at 117, 134.

The ALJ found these opinions persuasive because the records show that "counseling has helped the claimant's symptoms" and "the claimant's symptoms have stabilized when she stopped abusing drugs." (R. 22). In addition, the ALJ found that the "state agency consultants are impartial experts with Social Security Disability program knowledge and experience and their determinations are consistent with the evidence as a whole." *Id*.

Dr. Womontree rendered her opinion on August 10, 2017, two weeks before Nichole was robbed at gunpoint and physically assaulted. Dr. Womontree obviously did not consider evidence of deterioration in Nichole's mental condition as a result of the robbery and assault as it occurred subsequent to her rendering her opinion. Although Dr. Fritz provided his reconsideration opinion on November 8, 2017 and considered the robbery and assault in his assessment, he did not consider the most up to date mental health treatment records, which showed a subsequent deterioration in Nichole's mental health condition. Dr. Fritz's opinion was premised on only two pieces of evidence that post-dated the robbery and assault, an August 25, 2017 emergency room visit the day following the assault and a single primary care physician visit on September 11, 2017. (R. 111).

A review of the records following Dr. Fritz's opinion demonstrates a worsening of Nichole's symptoms associated with her mental impairments. For instance, on December 5, 2017, Nichole saw psychiatrist Dr. Balin Durr for a medication management session. Nichole reported: "I don't get out of bed" and "I don't like leaving [the] house. I have a lot of anxiety. I just feel really bad. I just want to be alone." (R. 764). Nichole told Dr. Durr she was "still having nightmares as a consequence of [the] robbery in August" and that she was sleeping off and on all night for a total of two to three hours of sleep. *Id*. Nichole reported that her depression symptoms were "somewhat better" when taking Topamax. Dr. Durr rated Nichole's depression as an 8 out of 10 and her anxiety as a 10 out of 10. *Id*.

On December 20, 2017, Crystal Silvestre, a licensed clinical professional counselor, completed an Adult Annual Mental Health Assessment Update (R. 605-07). As to Nichole's current mental health functioning, Ms. Silvestre wrote:

> She was making progress toward improving her daily functioning with employment and an apartment. However, she was the victim of a violent armed robbery and her life was threatened. She has been unable to work since that event. She is in physical therapy for injuries incurred during the robbery. She is very depressed and isolative now. She is afraid to leave her apartment. She becomes fearful even in her apartment. She cries easily in sessions. She is having interpersonal difficulties with her ex-husband and her current boyfriend. She is very worried about the mental health of her son. She recently had a miscarriage which increased her depression and isolation.

*Id*. at 605. Ms. Silvestre recommended that Nichole undergo individual mental health therapy "due to an increase in the severity of her depression, anxiety, and the recent traumas she has suffered. *Id*. at 607. Silverstre found that Nichole "demonstrate[d] symptoms of acute stress disorder" and noted that she "will need therapy services to help her decrease her symptoms and increase her daily and long term functioning." *Id*. In a Disability Report – Appeal dated December 22, 2017, Nichole indicated that her "conditions had gotten worse after being mugged and beaten."

*Id*. at 319; *see also* (R. 307 – 9/28/2017: "All of my conditions are worsening, especially my mental health because I was robbed at gun point.").

On January 3, 2018, Nichole returned to see Dr. Durr for medication management. Dr. Durr rated Nichole's depression as 7 out of 10 and noted that Nichole reported passive suicide ideation "a lot" with no plan or intent. (R.755). Dr. Durr noted that Nichole's anxiety was a 7 out of 10 and wrote: Nichole "has the same recurring nightmares from childhood and robbery. It can be pretty rough where she wakes the whole household up." *Id*. Dr. Durr remarked that Nichole's energy was "real low" and she did not really have an appetite. *Id*. Upon exam, Nichole's mood and affect were "okay" and "depressed, tearful." *Id*.

Nichole had a follow-up appointment with her primary care physician on January 11, 2018. At the time of the visit, Nichole reported that she had gained a lot of weight and her BMI was 40.4. (R. 635, 637). Nichole complained of continued nightmares and flashbacks of the robbery and from her childhood trauma. *Id*. at 637. She reported being easily startled and frightened, loud noises frightening her, very anxious, not sleeping well, afraid to leave her house, very tearful, afraid that someone is following her, very depressed, having no energy or motivation, feeling hopeless and helpless, being unable to talk without crying, her sleep and appetite were not good, having anxiety and panic attacks, and her memory and concentration were not good. *Id*. Her mental status exam showed a fair memory, sad and depressed mood, and anxious, sad, and tearful affect. *Id*. Dr. Sherrie Godbolt stated that Nichole was "currently having PTSD symptoms" and noted that her mediations had "given her some relief." *Id*. at 638. Dr. Godbolt advised Nichole to continued with her current medications and therapy and increase Ativan to twice a day. *Id*.

On January 12, 2018, an Individualized Mental Health Treatment Plan Review completed by Ms. Silvestre indicated that Nichole had made good progress toward her goal of decreasing her

depression and anxiety using cognitive and behavioral techniques, as well as medication. (R. 614). Ms. Silvestre wrote: "Nichole is medication compliant. She has been using effective coping skills to help decrease daily stress. However, she recently suffered a life threatening trauma and is trying to cope with PTSD which exacerbates her depression." *Id*. Ms. Silvestre recommended that Nichole continue with individual counseling and therapy "as she continues to cope with life stressors in recovery." *Id*.

Nichole followed up with Dr. Godbolt again on February 20, 2018. Nichole reported that she was depressed and "not doing very good." (R. 633). Nichole relayed that she had had an appointment with a doctor for workman's compensation and was traumatized at the interview. *Id*. Nichole also stated: she was still having nightmares and flashbacks but they were not as frequent; her sleep was not good; her appetite was fair; she was anxious all day; she had been having panic attacks; she was tired of feeling depressed; she still had PTSD symptoms; and she thought her medications were "helping a little." *Id*. Dr. Godbolt noted that Nichole was very tearful. *Id*. A mental status exam revealed that Nichole's memory was fair, her mood was sad and depressed, and her affect was anxious, sad, and tearful. *Id*. at 634. Dr. Godbolt advised Nichole to continue her medications and therapy and increase Lexapro to 1 ½ tablets a day. *Id*.

In a letter dated April 27, 2018, Ms. Silvestre indicated that Nichole had engaged regularly with mental health therapy services since December 2, 2016. (R. 784). She noted that Nichole's recent trauma of being physically assaulted, held at gun point, and having her life threatened during a robbery had led a diagnosis of PTSD. *Id*. Ms. Silverstre also noted that Nichole reported chronic pain related to that incident which interfered with her daily functioning. *Id*. Ms. Silvestre opined that Nichole continued to suffer from symptoms of major depressive disorder and recommended

that she continue with individual mental health therapy to decrease her depressive symptoms and increase her daily and long term functioning. *Id.*

At the hearing on July 31, 2018, Nichole testified that her anxiety about being around people and "bad things happening to [her]" became "extremely exacerbated because of the robbery." (R. 44). She stated that "[a]fter the robbery, [she] spent a lot of time alone." *Id.* at 52. Nichole testified that she continues to engage in self-cutting but does not discuss it with her doctors because she fears being hospitalized. *Id.* She said she experiences four to five panic attacks per week which last from 20 minutes to as long as an hour. *Id.* at 49-50. Nichole testified she takes Ativan on a daily basis for her anxiety. *Id.* at 50. With regard to her depression, Nichole stated that sometimes she stays in bed for days and only gets up to use the bathroom and make her son food. *Id.* at 53.

In light of this new, significant evidence of deterioration of Nichole's mental condition that the state agency psychological consultants did not review, it was error for the ALJ to credit their opinions. At a minimum, the above evidence created an ambiguity as to whether Nichole's mental health symptoms significantly increased in severity after the robbery and assault that required further inquiry. The ALJ failed to appropriately explain why Drs. Womontree's and Fritz's opinions remained probative or were not rendered stale, especially given that the ALJ explicitly found that when Nichole "was victimized in an assault in her workplace [] she saw an exacerbation in her [mental health] symptoms." (R. 22). Despite recognizing an exacerbation of mental health symptoms, the ALJ reached the same conclusions as the state agency psychological consultants who had not reviewed Nichole's most recent mental health treatment records. Additionally, the record contained no other medical opinion subsequent to the robbery and assault which assessed Nichole's mental functional abilities and limitations.

Moreover, when finding that the state agency psychologists' opinions were consistent with the evidence as whole, including the evidence post-dating the robbery and assault, the ALJ impermissibly offered his own medical opinion. It is not clear that the record before and after Dr. Fritz's opinion demonstrates substantially similar mental health limitations and findings and the ALJ was not qualified to make that conclusion. *See Atkin*, 887 F.3d at 317 ("without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."). The ALJ also noted that Nichole "experienced panic attacks after being the victim of an armed robbery" but stated that "her difficulties with interaction are accounted for in the residual functional capacity." (R. 22).[6] The ALJ was not free to interpret the post-September 2017 mental health evidence, including Nichole's panic attacks based on the armed robbery, and determine that she would have no more than a moderate limitation interacting with others. Instead, medical expertise was required to determine the significance of the post-September 2017 mental health evidence and assess functional capacity. *Moreno v. Berryhill*, 882 F.3d 727, 728-29 (7th Cir. 2018) (remand for new mental health assessment where ALJ relied on state agency psychologist opinion that the court found "stale" in light of treating psychologist's office more recent notes "revealing significant and new

---

[6]    Nichole points out that at step three, the ALJ based his finding that she had a moderate limitation on her ability to interact with others only on her non-substantial gainful activity as a cashier. (R. 17). The ALJ concluded that Nichole's ability to "work as a cashier after the alleged onset date of disability . . . indicates an ability to interact with others on a consistent bas[is] and supports only moderate limitations in this domain." *Id*. Because Nichole's work as a cashier referred to her abilities before she was assaulted, she argues that it is unclear whether the ALJ's finding of a moderate limitation on her ability to interact with others addressed the worsening of her mental impairments following the attack. The Commissioner responds that the "ALJ plainly tied his paragraph B findings to those of the State agency psychologists." Doc. 21 at 8. Although the ALJ's paragraph B findings match the state agency psychologists' paragraph B findings, the ALJ did not explicitly cite or state that he was relying on the state agency psychologists' assessments at step three. (R. 17). In any case, as explained herein, the state agency psychologists failed to consider the most recent evidence regarding Nichole's worsening mental health symptoms. Additionally, the Court notes that all the evidence the ALJ cited in support of all of his other paragraph B findings was generated before Nichole was attacked on August 24, 2017.

development in [plaintiff's] mental health that could have affected" the state agency psychologist's assessment and the ALJ's own assessment of the more recent records was not justified). Because the record contains substantial evidence demonstrating the worsening of Nichole's mental condition since the state agency psychological consultants reviewed the record, it was improper for the ALJ to rely on their opinions to determine Nichole's mental RFC.

In sum, the ALJ erred in relying on outdated opinions of the state agency psychological consultants and on his own lay interpretation of the subsequent mental health records. A remand is required so the ALJ can reevaluate Nichole's mental RFC based upon opinion evidence from psychological experts who have considered the entire record. Because a remand is necessary for the above reasons, the Court need not address Nichole's other arguments concerning the state agency psychologists' and Dr. Carter's assessments.

## <u>CONCLUSION</u>

For all of these reasons, the Court finds reversible errors in the ALJ's assessment of Nichole's physical and mental RFC. The Commissioner's final decision denying Nichole's applications is reversed and this case is remanded for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff Nichole M. S. and against the Commissioner.

**SO ORDERED.**

Dated:  February 12, 2021

_____
Sunil R. Harjani
United States Magistrate Judge